FILED

APR 03 2026

# UNITED STATES DISTRICT COURT
### for the

Eastern District of North Carolina

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

|  |  |  |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 5:26-mJ-1529-Bm |
| COURTNEY P. WILLIAMS | ) | |
|  | ) | |
|  | ) | |
|  | ) | |
|  | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___Jan 10, 2022 - Aug 12, 2025___ in the county of ___Cumberland___ in the ___Eastern___ District of ___North Carolina___ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, U.S.C. § 793(d) | Communicating and Transmitting information relating to the National Defense classified as SECRET//NOFORN, specifically tactics, techniques, and procedures used by a special military unit stationed at Fort Bragg, N.C., to execute covert missions without being detected, which information the defendant had reason to believe could be used to the injury of the United States, to a person or persons not entitled to recieve it, to wit: Reporter 1, who subsequently published this classified national defense information in a news article and a book. |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

On this day, Jocelyn Fox, appeared before me via reliable electronic means, that is, by telephone, was placed under oath, and attested to the contents of this Complaint.

Date: __April 3, 2026; 2:29 pm__

City and state: ___Raleigh, N.C.___

_____
*Complainant's signature*

Jocelyn Fox, Special Agent, FBI
*Printed name and title*

_____
*Judge's signature*

BRIAN S. MEYERS, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:26-mJ-1529-Bm

| | |
|---|---|
| UNITED STATES | |
| v. | **Filed Under Seal** |
| COURTNEY P. WILLIAMS | |

## AFFIDAVIT IN SUPPORT OF
## CRIMINAL COMPLAINT

I, Special Agent Jocelyn Fox, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of a criminal complaint against **COURTNEY P. WILLIAMS** (hereinafter "**WILLIAMS**") charging her with Communicating and Transmitting National Defense Information in violation of Title 18, United States Code, Section 793(d). Based on my training and experience, there is probable cause to believe that **WILLIAMS** committed that crime.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI). I have been employed by the FBI since March 2018. I have been trained by the FBI to investigate federal criminal activity and to protect the security interests of the United States of America. From July 2019 to July 2024, I was assigned to a squad focusing on intelligence threats from the Government of Russia, responsible for detecting, deterring, and frustrating the efforts of Russian intelligence agents and agencies

1

within the FBI Seattle Field Office's area of responsibility. From August 2024 to present, I have been assigned to a squad focusing on intelligence threats from the Government of Russia, the Government of China, and other adversaries, as well as other national security threats such as the unauthorized disclosure of national security information, within the FBI Charlotte Field Office's area of responsibility. As an FBI Special Agent, I have training in the preparation, presentation, and service of criminal complaints and arrest and search warrants.

3.     The information contained in this affidavit is based upon my personal knowledge and observation, my training and experience, communications with other law enforcement officers and witnesses, and the review of documents and records, in addition to information obtained from search warrants. Since this affidavit is being submitted for the purpose of establishing probable cause for the issuance of an arrest warrant, I have not included each and every fact known to me concerning this investigation, and have set forth only those facts I believe are necessary to support issuance of the complaint and arrest warrant.

4.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully assert that there is probable cause to believe that in or around January 2022 to August 2025, WILLIAMS willingly communicated classified National Defense Information (NDI) to an individual without authorization to receive such information in violation of Title 18, United States Code Section 793(d) (Gathering, Transmitting, or Losing Defense Information).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

2

## BACKGROUND ON CLASSIFIED INFORMATION

5.      Under Executive Order 13526, the unauthorized disclosure of material classified at the "TOP SECRET" level, by definition, "reasonably could be expected to cause exceptionally grave damage to the national security" of the United States. Exec. Order 13526 § l.2(a)(l), 75 Fed. Reg. 707, 707-08 (Jan. 5, 2010). The unauthorized disclosure of information classified at the "SECRET" level, by definition, "reasonably could be expected to cause serious damage to the national security" of the United States. Exec. Order 13526 § l.2(a)(2). The unauthorized disclosure of information classified at the "CONFIDENTIAL" level, by definition, "reasonably could be expected to cause damage to the national security" of the United States. Exec. Order 13526 § l.2(a)(3).

6.      Classified information of any designation may be shared only with persons determined by an appropriate United States Government official to be eligible for access, and who possess a "need to know." Among other requirements, for a person to obtain a security clearance allowing that person access to classified United States Government information, that person is required to and must agree to properly protect classified information by not disclosing such information to persons not entitled to receive it, by not unlawfully removing classified information from authorized storage facilities, and by not storing classified information in unauthorized locations. If a person is not eligible to receive classified information, classified information may not be disclosed to that person.

3

## STATUTORY DEFINITIONS

7.     18 U.S.C. § 793 applies to activities such as gathering or transmitting defense information to an unauthorized person information pertaining to the national defense, which could cause damage to the national security.

8.     "Damage to the national security" means harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information. *See* ~~Under~~ Executive Order 13526 §6.1(l).

*Edits made at direction of Affiant. BSM 04/03/2026*

9.     Pursuant to 18 U.S.C. § 793(d), "[w]however, lawfully having possession of, access to, or control over any document, writing, . . . photograph, . . . or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted" or attempts to do or causes the same "to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it" shall be fined or imprisoned not more than ten years, or both.

## PROBABLE CAUSE

10.     From 2010 to 2016, **WILLIAMS** worked for a Special Military Unit (SMU) in the U.S. Army and held a TOP SECRET/SENSITIVE COMPARTMENTED INFORMATION (TS/SCI) U.S. Government security clearance. Following the end of

4

her employment with the SMU, **WILLIAMS** had multiple conversations between 2022 and 2025 with an investigative journalist (hereinafter "the Journalist") in which she revealed classified National Defense Information. Following these conversations with **WILLIAMS**, the Journalist published an online Article (hereinafter "the Article") and Book (hereinafter "the Book"), both of which identified WILLIAMS by name as a source and set forth information relating to the SMU. The Article and the Book also both contained classified NDI provided by WILLIAMS to the Journalist and, when published, communicated the same to an unknown number of individuals not authorized to receive it, including potentially to adversaries of the United States.

## A. WILLIAMS had Lawful Possession of Classified Material and Signed a Classified Non-Disclosure Agreement

11. From 2010 to 2016, **WILLIAMS** worked for an SMU at Fort Bragg, North Carolina. Fort Bragg, including where **WILLIAMS** worked, is in the Eastern District of North Carolina. **WILLIAMS** was initially hired as a cleared defense contractor in April 2010, and then transitioned to be a civilian Department of War employee in November 2010. During these roles, **WILLIAMS** performed duties within a SMU as an Operational Support Technician within the Mission Support Troop ("MST"). **WILLIAMS**'s duties included support of specific Tactics, Techniques and Procedures ("TTPs") used by operational components of the SMU in preparation for and during sensitive missions. If **WILLIAMS** did not perform the functions of her role adequately, operational members of the SMU faced the risk of exposure, detention in nations hostile to the United States, bodily harm, and death.

12. TTPs are standardized operating guidelines or workflows often used by military units to ensure that specific tasks are done the same way by all unit members. Broadly speaking, standardized TTPs help enforce safety standards and enable new unit members to learn the specific details of accomplishing a task. For example, a unit may have TTPs for loading an aircraft with equipment required for a mission. Certain aspects of TTPs may be classified, depending on the nature of the unit and the type of mission. Adversaries of the United States likely study TTPs to defend against them, so if such information is disclosed without lawful authority, it would raise the risk of mission failure or bodily harm to the military members utilizing those TTPs and rendering the TTPs obsolete or in need of substantial modification to continue use.

13. To perform the functions of her employment, **WILLIAMS** held and maintained a TS/SCI U.S. Government security clearance. And as a condition of her employment with the SMU, **WILLIAMS** signed a Classified Information Nondisclosure Agreement (NDA) on April 19, 2010. **WILLIAMS** printed her name at the top of the agreement, which begins by stating "[i]ntending to be legally bound, I hereby accept the obligations contained in this Agreement in consideration of my being granted access to classified information." The NDA also states:

> I hereby acknowledge that I have received a security indoctrination concerning the nature and protection of classified information, including the procedures to be followed in ascertaining whether other persons to whom I contemplate disclosing this information have been approved for access to it, and that I understand these procedures...I further understand that I am obligated to comply with laws and regulations that prohibit the

6

unauthorized disclosure of classified information…Unless and until I am released in writing by an authorized representative of the United States Government, I understand that all conditions and obligations imposed upon me by this Agreement apply during the time I am granted access to classified information, and at all times thereafter.

14. Paragraph 4 of the agreement states briefers advised **WILLIAMS** of the potential consequences of breaching the NDA, including the termination of her security clearance, removal from "any position of special confidence and trust," or termination of her employment. That paragraph continues by noting that **WILLIAMS** has been advised that "any unauthorized disclosure of classified information by me may constitute a violation of United States criminal laws, including the provisions of Sections 641, 793, 794, 798, 952, and 1924, Title 18, United States Code."

15. During her orientation with the SMU, **WILLIAMS** also received a classified information security briefing. As part of that briefing, **WILLIAMS** signed a summary of that briefing. Paragraph 2 of that briefing states:

I agree that I will never divulge, publish, or reveal by writing, word, conduct, or otherwise, to any unauthorized person, any classified or sensitive information relating to the United States Army Special Operations Command (USASOC), to include information about subordinate units…without the prior consent of the Commander, USASOC, or his designated Security Representatives.

16. On or about February 7, 2011, **WILLIAMS** additionally signed a Sensitive Compartmented Information Nondisclosure Statement (DD Form 1847-1).

7

17. According to unit records, **WILLIAMS** had daily access to a broad range of classified NDI. Her duties involved providing support to classified operations, which required her to be familiar with and to implement various TTPs. It also required her to learn the true names and identities of members of the SMU.

18. In and around 2015 and 2016, based on an internal investigation, the SMU suspended **WILLIAMS**'s access to classified information and assigned her to a position that did not require access to classified information.

19. In 2016, **WILLIAMS** left her job with the SMU. At that time, **WILLIAMS** was debriefed, which is standard procedure for U.S. government employees leaving a role in which they had access to classified information. The debriefing covers the individual's continued obligation to protect classified information beyond the time of their access to such information, and beyond the time of their employment by the U.S. Government. **WILLIAMS** signed a Classified Information NDA indicating a debriefing on September 1, 2015. **WILLIAMS** signed an additional security debriefing specific to the unit on the same day.

## B. Pre-Publication Communications Between WILLIAMS and the Journalist

20. Records obtained during the course of the investigation have identified **WILLIAMS's** phone number as ending in -6061. Additionally, that number is listed as her contact telephone number for a social media platform in or about November 2018 and on a loan application in or about April 2025. Separately, records obtained during this investigation, including open-source law enforcement databases, have shown that the Journalist uses the telephone number 512-XXX-XXXX (hereinafter,

"Journalist's Phone Number"). Additionally, **WILLIAMS** saved the Journalist's Phone Number in her contacts list under the Journalist's true name.

21.    On August 12, 2025—the date of publication for the Article and the Book—phone records show **WILLIAMS's** number contacted the Journalist's Phone Number.

22.    I have reviewed **WILLIAMS's** phone records, which show ongoing contact with the Journalist from 2022 to present day. This includes:

   a.  On or about January 10, 2022, the Journalist's Phone Number contacts **WILLIAMS's** number. The call was forwarded to voicemail and lasted four seconds;

   b.  On or about January 17, 2022, the Journalist's Phone Number contacts **WILLIAMS's** number. The telephone call lasts for 144 minutes and 27 seconds;

   c.  On or about October 25, 2022, the Journalist's Phone Number contacts **WILLIAMS's** number. The telephone call lasts for 123 minutes and 30 seconds;

   d.  On or about October 25, 2022, the Journalist's Phone Number contacts **WILLIAMS's** number for a second time. The telephone call lasts for 165 minutes and 12 seconds;

   e.  On or about November 2, 2022, the Journalist's Phone Number sends **WILLIAMS** a text message, noted as an image;

9

f. On or about January 27, 2024, the Journalist's Phone Number contacts **WILLIAMS's** number. The call lasts two seconds;

g. On or about January 27, 2024, **WILLIAMS's** Phone Number contacts the Journalist's Phone Number. The call lasts for 208 minutes and 15 seconds;

h. On or about January 27, 2024, after the aforementioned call, **WILLIAMS's** number sends the Journalist's Phone Number a text message, noted as an image.

23. Based upon my training and experience, and in light of the Journalist's later publication of classified NDI which the Journalist attributed to **WILLIAMS** in true name, I have probable cause to believe that **WILLIAMS** and the Journalist discussed **WILLIAMS's** employment at the SMU and associated information during those consistent and extensive phone conversations.

24. According to information obtained during this course of this investigation, in addition to the above-referenced telephone calls, **WILLIAMS's** number exchanged approximately 180 text messages with the Journalist between 2022 and 2025.

25. In one such text message from the Journalist to **WILLIAMS** in or around early 2022, the Journalist identifies themselves as a journalist and states that they are seeking information about the SMU to support upcoming articles and an upcoming book.

10

26.     On or about January 14, 2022, **WILLIAMS** sent a text message to the Journalist stating, "I responded to your email, I'm available any day after 5, the weekend or also Monday because of the holiday. I just don't want my kids to be present due to the content of what happened. Thanks."

27.     Later that same year, on or about November 2, 2022, the Journalist messaged **WILLIAMS** stating, "Hi [**WILLIAMS**]. Hope you guys had a great holiday weekend. Just wanted to let you know I dropped this in the mail today for the thumb drive. It's stamped and addressed and ready to be sent back, no need to go to the post office!" As noted above, a week before that text message, **WILLIAMS** and the Journalist talked on the phone on two separate occasions. These phone calls lasted approximately 288 minutes combined.

28.     Based upon my training and experience, the text message from the Journalist to the **WILLIAMS** on November 2, 2022, regarding the return of an external storage device via a self-addressed, prepaid envelope indicates that WILLIAMS provided documents, photographs, notes, and/or other materials to the Journalist, some of which likely contained classified NDI that was subsequently published in the Article and the Book.

## C. Publication of the Article in August 2025

29.     On August 12, 2025, the Journalist published the Article about the SMU. The Article identified **WILLIAMS** by name. Photographs of **WILLIAMS** were included in the Article, and **WILLIAMS** was credited as providing them. **WILLIAMS** also posted about the article on a social media platform using an account

11

in her true name. Subscriber information confirms that **WILLIAMS** is the owner and user of the account. Additionally, the post by **WILLIAMS** endorses the Article and confirms that **WILLIAMS** disclosed the information within the Article to the Journalist.

30. The Article focused on the experience of **WILLIAMS** as an employee of the SMU on Fort Bragg and included details of **WILLIAMS's** position and duties at the SMU. The Article additionally details **WILLIAMS's** allegations of mistreatment at the SMU. The Article noted it was excerpted from the Book written by the Journalist, which was due to be published shortly thereafter.

31. As part of this investigation, an Original Classification Authority for the SMU reviewed the information within the Article and determined that it contained information that is properly classified as SECRET. The Original Classification Authority further determined the information has a dissemination control of "No Foreign Dissemination" or "NOFORN." Accordingly, the information may not be disseminated in any form to foreign governments, foreign nationals, foreign or international organizations, or non-U.S. citizens. The Article explicitly attributes much of this classified information to **WILLIAMS** in her true name. The classified information comprised, in part, TTPs utilized by the SMU to execute sensitive operations.

**D. Publication of the Book in August 2025**

32. On August 12, 2025, the Journalist published the Book, from which the Article had been excerpted. The Book contains a chapter in which **WILLIAMS** is

12

quoted as the main source of substantive information. In the notes section of the Book, the Journalist states that information in the chapter comes "primarily from interviews with [**WILLIAMS**]."

33.    As part of this investigation, an Original Classification Authority reviewed the Book and determined that it contained information classified as SECRET. The Original Classification Authority further determined the information has a dissemination control of "No Foreign Dissemination" or "NOFORN." Accordingly, the information may not be disseminated in any form to foreign governments, foreign nationals, foreign or international organizations, or non-U.S. citizens. Just like the Article, the Book explicitly attributed much of this classified information to **WILLIAMS** in her true name. The classified information comprised, in part, specific TTPs utilized by this SMU to execute sensitive missions.

**E. Post-Publication Communications between WILLIAMS and the Journalist.**

34.    Following publication of the Article and the Book, **WILLIAMS** continued to communicate with Journalist.

35.    For example, on or about August 12, 2025 (the date of publication), **WILLIAMS** sent the following text message to the Journalist:

> After quickly reading through everything I will just say I wish you had sent me a copy of what was to be published prior to publishing. Other than a few factual errors, **I would definitely have been concerned with the amount of classified information being disclosed.** I thought things I was telling you so you could have a better general understanding of how the [SMU] was set up or operated would not be published and it feels like an entire TTP was sent out in my name giving them a chance to

13

> legally persecute me and probably [Person 1]. I didn't feel like the overall story that all of these women, to include myself, were all accomplished and intelligent, not just a set of tits, we were a brilliant group of women trying to do what was right for the [SMU] and country. We truly believed in the mission, we put our blood, sweat and tears into the mission of that building, the cover capabilities and protecting those men and women with every ounce of our energy on a daily basis. Only to be forced out for trying to make the [SMU] a better place for all genders and races to work. [Person 1] often tried to bring up the lack of diversity in the [SMU] to key leaders but no one would listen. It just feels like the mark was missed. I'm taking deep breaths, but have a feeling this is going to be more of a nightmare for my children than not.

(emphasis added).

36.    Additional records obtained during this investigation also showed a conversation between **WILLIAMS** and her mother related to the Book.  In these statements, **WILLIAMS** explains to her mother that "I might actually get arrested, and I don't even get a free copy of the book." When her mother asked why she may be arrested, **WILLIAMS** responded "for disclosing classified information." **WILLIAMS** then she proceeds to cite Title 18, United States Code Section 798, which is entitled "Disclosure of classified information."[1] In response to her mother asking who made her aware that she could be in legal jeopardy, **WILLIAMS** sent a string of messages saying "I have known my entire career...they [the SMU] tell you everyday...100 times a day."

---

[1] 18 U.S.C. §798 criminalizes disclosure of classified information specifically related to cryptographic systems and communications intelligence.

14

37.     Finally, the investigation has also identified email communications between **WILLIAMS** and the Journalist where **WILLIAMS** appears to transmit documents to the Journalist.   The contact between the Journalist's email and **WILLIAMS's** email was bidirectional.   Additionally, **WILLIAMS** had saved documents on her computer with the following names: "Batch 1 for Reporter," "Batch 2 for Reporter." Thus far, the investigation has identified at least 10 batches of documents gathered that **WILLIAMS** intended to provide to the Journalist. Those batches include **WILLIAMS's** personnel documents from her time with the SMU.

## CONCLUSION

38.     From her time as an employee of the U.S. Army at Fort Bragg, North Carolina, **WILLIAMS** lawfully possessed documents, writings, photographs, and other information relating to the national defense which information **WILLIAMS** had reason to believe could be used to injure the United States or to the advantage of a foreign nation. Despite knowing it was unlawful to do so, **WILLIAMS** willfully communicated, delivered, and transmitted and caused to be communicated, delivered, and transmitted the same to an individual not authorized to receive it; to wit: the Journalist.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

15

39. Based on the foregoing, your affiant respectfully asserts there is probable cause to believe **WILLIAMS** communicated and transmitted national defense information in violation of Title 18, United States Code, Section 793(d).

Respectfully Submitted,

JOCELYN FOX
Special Agent
Federal Bureau of Investigation

On this 3ʳᵈ day of April 2026, Special Agent Jocelyn Fox appeared before me via reliable electronic means, was placed under oath, and attested to the contents of this affidavit. via telephone at 2:29 pm.

BRIAN S. MEYERS
United States Magistrate Judge
Eastern District of North Carolina

16